Filed 5/27/16  P. v. Shutz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LEIGH SHULTZ,<br><br>    Defendant and Appellant. | D069906<br><br><br><br>(Super. Ct. No. RIF151165) |

APPEAL from a judgment of the Superior Court of Riverside County, Mac R. Fisher, Judge.  Affirmed as modified.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant David Leigh Shultz was charged by information with aggravated oral copulation by force (Pen. Code,[1] §§ 269, subd. (a)(4) & 288a; count 1); aggravated rape of a child under 14 years of age and seven or more years younger than defendant (§§ 269, subd. (a)(1) & 261, subd. (a)(2) or (a)(6); count 2); nine counts of forcible lewd and lascivious acts on a child under 14 years of age (§ 288, subd. (b)(1); counts 3-11); and sexual intercourse with a child under 16 years of age (§ 261.5, subd. (d); count 12). All 12 counts involved Jane Doe, defendant's biological daughter.

At defendant's first trial, the jury hung 11 to 1 in favor of guilt on all counts. On retrial, defendant represented himself. A jury returned guilty verdicts on all counts as charged. The court sentenced defendant to an indeterminate term of 30 years to life and to a determinate term of 73 years.

On appeal, defendant contends that the court abused its discretion and thus erred when it admitted under Evidence Code section 1108 evidence of his uncharged sexual misconduct against Nicole S.; that the court erred in instructing the jury with CALCRIM Nos. 1111 and 1191; that he was unduly prejudiced by the cumulative effect of the errors in admitting evidence of the uncharged sexual misconduct and in instructing the jury with CALCRIM No. 1191; that the court erred in failing to give instructions on alleged lesser included offenses in connection with counts 1 and 2; that his sentence constitutes cruel and unusual punishment; and that there is a clerical error in the abstracts of judgment regarding when counts 1-12 were committed.

---

[1] All further statutory references are to the Penal Code unless noted otherwise.

2

As we explain, we agree there is a clerical error in the abstracts of judgment with respect to the date ranges for counts 1-12. In all other respects, we affirm the judgment of conviction.

## FACTUAL BACKGROUND[2]

Doe testified that she was born in December 1994. Doe, along with her older brother C., lived with defendant (their father) in Pennsylvania. Their mother Heather lived with the family "[o]n and off." When she was about four years old, defendant, Doe and her brother, but not Heather, moved to California.

Doe testified before the family moved to California, defendant made Doe touch his "genitals" with her hand. Doe testified that the touching was "skin-to-skin"; that by "genitals" she meant his erect "penis"; and that when this touching occurred, they were alone.

Doe specifically described for the jury how defendant took her hand, put it on his penis and showed her how he wanted to be touched, which involved moving her hand "[u]p and down" on his penis. When this touching occurred, defendant had his pants completely off and was laying on the bed. Doe touched defendant's penis for about 10 or 15 minutes. Doe was afraid she would be spanked by defendant if she did not follow his instructions. While Doe was touching defendant's penis, he instructed her not to tell

---

2      We view the evidence in the light most favorable to the judgment of conviction, to the extent there is a conflict in the evidence. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Certain portions of the factual and procedural history related to defendant's claims of alleged error are discussed *post*, in connection with those issues.

anyone because the "police would be called," or words to that effect. At the time, Doe's mother was not living with the family.

Doe testified that when she was four years old, defendant forced her to touch his penis with her hand between three to five times and with her mouth once or twice. With regard to oral copulation, defendant instructed Doe first to touch his penis with her hand. As she was doing so inside his bedroom, where most of the sexual abuse occurred, defendant then asked her to use her mouth. Because defendant placed his hand behind Doe's head while she orally copulated him, Doe was unable to "squirm away." Doe estimated she orally copulated defendant for about 10 to 15 minutes, and, as before, he told her not to tell anybody.

After the move, the family initially lived in Irvine for about a year. While living in Irvine, defendant did not sexually abuse Doe because, according to Doe, defendant "had a girlfriend." They next moved to Corona, where defendant resumed his sexual abuse of Doe.

Doe testified that when she was about five years old, in kindergarten, defendant forced her to touch his penis "skin-on-skin" with her hand and with her mouth. As the frequency of abuse increased, Doe testified defendant no longer needed to instruct Doe to initiate the touching, but instead merely asked her to "make him feel good."

While living in Corona over a six-year period, Doe testified that she was forced to orally copulate defendant "[a] lot." When asked what she meant by "[a] lot," Doe testified a "couple times a month." Doe estimated between the ages of five and 11 she orally copulated defendant "probably over" 20 times. On these occasions, defendant

4

threatened that, if Doe told anyone about the touching, the police would come and take Doe and her brother away.

When Doe was in third or fourth grade, she told defendant she wanted to shave her legs. Defendant told Doe he would have to help her. While Doe was naked in the bathtub, defendant touched Doe's genitalia, which made her feel "really uncomfortable." Defendant next lifted Doe out of the bathtub, made her stand on the toilet with her back towards him, and tried to have sex with her. According to Doe, when that "didn't work, he tried to have sex with me on the floor." Defendant made Doe lie on her stomach. With defendant on top of her, defendant's penis went inside Doe's vagina "a little bit." Because it hurt and Doe made a noise in response, defendant stopped because C. was home and instead forced Doe to orally copulate him.

Doe estimated defendant engaged in sexual intercourse with her about five or six times during the six-year period they lived in Corona. Doe also estimated that during this same period of time, defendant touched her vagina both under and over her clothing about 10 to 15 times and digitally penetrated her vagina about five to 10 times. Defendant also orally copulated Doe during this same time frame. Doe was unable to "squirm away" from defendant when he was orally copulating her because defendant held onto her hips.

When Doe was about 11 years old, the family moved to another location in Corona. Defendant continued to sexually abuse Doe in their new home. Doe estimated that in the three or so years they lived in their new home, defendant forced her to orally copulate him about four times a month. Doe sometimes was able to convince defendant

5

not to sexually abuse her by telling defendant she was sick. Sometimes, however, defendant abused Doe even if she complained of not feeling well.

Defendant forced Doe to orally copulate him "until he was done." Doe testified that this meant until "sperm or semen" came out of defendant's penis. Doe estimated defendant's semen went into her mouth about 10 times. Doe described the taste as similar to "uncooked biscuits mixed with saltwater." During this same three-year period, defendant also engaged in sexual intercourse with Doe about 10 or 15 times. On most occasions, defendant wore a condom. Defendant also orally copulated Doe about 10 times and digitally penetrated her vagina about the same number of times during this three-year period.

On one occasion while living in their new home, defendant made Doe take a pregnancy test. According to Doe, defendant asked Doe whether she had gotten her period. When Doe told defendant she had not, he made her "pee in a cup, and he did the test." Because nothing happened, Doe assumed the test was negative.

Doe testified she decided to disclose defendant's sexual abuse when she was in the eighth grade because it was "escalating" and because she "finally realized it wouldn't be the end of the world to go to foster care." Doe thus told her counselor at middle school about the sexual abuse. A few months before telling her counselor, Doe disclosed to her classmates and teacher on "unity day" that she had been sexually abused, but she then did not go into detail.

With respect to her disclosure to the counselor, Doe testified her friend Meagan was having problems at home and wanted to speak to the counselor. Meagan asked Doe

6

to accompany her. While Meagan was talking to the counselor, Doe realized the counselor was "understanding and helpful." Doe asked Meagan to leave the room before she reported the sexual abuse by defendant. The counselor then contacted authorities.

Corona Police Officer Gregory Martinez testified he responded to the middle school in June 2009 after Doe reported the sexual abuse. Officer Martinez interviewed Doe and found her description of the abuse "extremely detailed." During the interview, Doe cried. Officer Martinez along with another officer next contacted defendant at home. Defendant denied the allegations of abuse during the short 15-minute interview.

Nicole testified she first met defendant when she was about eight years old while the family was living in Pennsylvania. Defendant, who was about 18 years older than Nicole, was the boyfriend of Nicole's aunt Heather (who was C.'s and Doe's mother). According to Nicole, defendant and Heather never married. Nicole looked up to Heather because Nicole's own mother was incarcerated, her father was a drug addict living in another state, and Heather was only about 10 years older than Nicole.

When Nicole was about 11 years old, she started spending more time at Heather and defendant's house. Because Nicole was then living with her great-grandparents, she began to trust and confide in defendant because he was younger and because he had taken Nicole and her sister to visit their mother in prison.

Initially, defendant supported Nicole "like any normal person would." However, as time went on, defendant began to say negative things to Nicole about her mother, father and grandparents. Nicole testified that while in the fifth grade, defendant began complimenting her by telling her how pretty she was and then kissed her. At first, the

7

kissing was just "on the lips." Later, defendant began "French kissing" Nicole, which she described as tongue-on-tongue. The kissing would occur either when Heather was not home or when Nicole and defendant were in the basement and Heather was upstairs. According to Nicole, Doe at the time was born, but not yet walking, and Doe's brother C. was probably about one and a half years old.

Nicole testified she did not tell Heather about the French kissing because Nicole was scared; she thought she had done something wrong; and she was concerned Heather would not believe her. In addition, defendant specifically told Nicole not to tell her sister or her aunt Heather because the kissing was, " 'you know, between us.' "

As time went on, defendant's French kissing of Nicole escalated into him "fondling [her] breasts" while they were "making out," which touching then "escalated to other places." Nicole testified this touching made her "very uncomfortable." Nicole estimated defendant French kissed her and touched her breasts more than 50 times when she was between the ages of about 10 and 14.

Defendant also touched Nicole's vagina, both on the outside and the inside of her clothes, skin-to-skin. Defendant also digitally penetrated Nicole's vagina. Often this abuse would occur when defendant was kissing Nicole. According to Nicole, when "this stuff happened" she became "numb" and just "laid there so it would be over sooner." Nicole estimated that over a four-year period, defendant digitally penetrated her vagina more than 10 times. On some of these occasions, Heather would be home. Because Nicole often stayed overnight, particularly during summer, defendant sometimes would abuse her in the middle of the night.

8

Nicole testified defendant forced her to orally copulate him when she was about 10 or 11 years old. Defendant guided Nicole's head onto his penis and instructed her to move her head up and down. This incident occurred in defendant's bedroom, while Heather was at work.

Nicole testified she tried to say "no" to defendant when he wanted her to orally copulate him. According to Nicole, defendant would try and talk her into it by telling her "it's not a bad thing to do, and people do this, and it's okay to do this. You know, a male and female, it's okay to do this, you know." Defendant also told Nicole that age was "just a number," and that it did not "matter how old he [was] and how old [she was]." Nicole estimated defendant forced her to orally copulate him probably more than 20 times over a four-year period.

Defendant also orally copulated Nicole. Nicole estimated defendant did so probably more than 20 times. In one incident, Nicole described how they were in defendant's room, on his bed. After defendant orally copulated her, they had intercourse. Heather was at work when this particular incident occurred. Nicole estimated she was forced to have sexual intercourse with defendant "definitely over 20" times during this four-year span. At times, defendant wore a condom because Nicole started menstruating when she was 11. At other times, defendant merely used spermicide.

Nicole testified that she continued to go to defendant's house, despite the sexual abuse, because defendant told her C. and Doe were crying and missing her. Defendant also told Nicole he needed help watching the children after Heather had left. Nicole also was afraid that, if she told authorities about the sexual abuse by defendant, C. and Doe

9

would lose their father and Nicole "didn't want to be the one to take their dad away from them by, you know, telling on him and him going to prison then," particularly because Heather was no longer living at the house.

When Nicole was about 13 years old, she began to like boys her own age. On one occasion when defendant saw Nicole kissing a boy after a seventh grade graduation party, he became jealous and irate. Defendant told Nicole that she was "cheating on him" and that boys were just "using" her because that is what boys "do."

Nicole testified that when she was 14 years old, she stood up to defendant and told him, " 'This isn't happening anymore.' And I told him, you know, 'You have a problem, and I'm not letting you . . . do this to me ever again.' And I stopped going there." Nicole estimated Doe was about three years old at this time. About six months later, defendant moved his family to California.

After the family's move, defendant called Nicole at an ice cream shop where she was working. One of Nicole's coworkers who "knew the situation" told defendant, " 'Never call here again.' " Defendant also sent Nicole between 900 and 1,000 emails. Nicole testified in many of these emails defendant claimed to "love" her.

Over the next 10 years while the family was living in California, Nicole had no contact with Doe. It was not until charges were filed against defendant that Nicole had some very limited contact with Doe. However, a few years after the family moved to California, Nicole began to have contact with Heather, who had remained behind in Pennsylvania. Heather at the time had become "clean" and had remarried.

10

Nicole testified when she was about 11 or 12 years old she told her sister about the sexual abuse by defendant. She also told another friend, and, when she was 16, she told her friend "Bob," whom she married years later. Also when she was about 16 years old, Nicole told Heather about the sexual abuse by defendant. Heather in response told Nicole to notify police. Nicole then decided not to inform police because she wanted "it to all go away." However, when she was 17 years old, authorities came to Nicole's school and Nicole disclosed she had been sexually abused by defendant.

When Doe finally told her guidance counselor about the sexual abuse by defendant, Nicole estimated she was about 24 or 25 years old. Nicole testified if she had known defendant had been molesting his daughter while the family was living in California, Nicole would have come forward sooner to report the sexual abuse.

Corona Detective Dan Neagu testified Heather sent him a four-page letter dated June 24, 2009 that she received from defendant while he was incarcerated on charges in the instant case. In this letter, defendant talked about Nicole, stating:

" 'As for Nicole, whatever she wants. Nicole is the only person who ever made me feel loved. I have never for a second stopped loving her, and never will, no matter what. She is the only reason I stayed alive. I would die for her, if that's what she wants. I couldn't be with anyone because of her. I've *waited for her*. You did everything you could eight or nine years ago to turn her against me, and you succeeded. [¶] Between her, my kids, you and their mother, and all the progress I've made in recent years for my family's future, I've lost everything I cared about. There is nothing else. Nothing else matters.' " (Italics added.)

11

Dr. Susan Horowitz testified that at all times relevant she worked for the Riverside County Regional Medical Center in the child abuse unit; that she conducts exams on children when abuse is suspected; and that she examined Doe on or about June 11, 2009. Dr. Horowitz found the condition of Doe's hymen to be " 'indeterminate,' " noting Doe had "some partial defects . . . that could have been a result of smaller tears" that had since healed. However, Dr. Horowitz opined that in 90 to 95 percent of the exams where children have been subject to sexual abuse, the examinations are "normal." Dr. Horowitz concluded her examination of Doe was "consistent with sexual contact, but it [was] not definite or proof of sexual contact."

## DISCUSSION

## I

### Admission of Uncharged Sexual Misconduct Against Nicole

A. *Evidence Code Section 1108 and Due Process*

Evidence Code section 1108 is a legislative exception to the general rule prohibiting character evidence in the form of specific acts. (Evid. Code, § 1101; *People v. Callahan* (1999) 74 Cal.App.4th 356, 367 (*Callahan*) [noting "the enactment of [Evidence Code] section 1108 expanded the scope of permissible character evidence to include evidence of the type described in the new statute, i.e., 'evidence of the defendant's commission of another sexual offense or offenses' "].) In enacting Evidence Code section 1108, " 'the Legislature "declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness." ' " (*Callahan*, at

12

p. 367.)  " 'Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence.  The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)

Defendant, like others before him, initially contends Evidence Code section 1108 violates the due process clause on its face and/or as applied to him.[3]  In making this contention, defendant recognizes our high court rejected nearly the identical argument when it concluded a "trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge."  (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)  This is so even in the case of an uncharged offense.  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1165–1166 (*Villatoro*).)

Our high court explained the Legislature's "principal justification for adopting [Evidence Code] section 1108 was a practical one:  By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence.  The ensuing trial often presents conflicting versions of the event and requires

---

[3]    We note defendant did *not* raise this objection in the trial court as a basis to exclude Nicole's testimony.  As such, the People contend the issue is forfeited.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 122-123 [noting the defendant's "contention that the admission of the other-crimes evidence violated his state and federal constitutional right to a fair trial is waived because it was not raised below"].)  Notwithstanding, as we discuss Evidence Code section 1108 does not offend due process.

the trier of fact to make difficult credibility determinations. [Evidence Code] section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta*, *supra*, 21 Cal.4th at p. 915.)

" 'By subjecting evidence of uncharged sexual misconduct to the weighing process of [Evidence Code] section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. [Citation.] This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence. [Citation.] *With this check upon the admission of evidence of uncharged sex offenses in prosecutions for sex crimes, we find that . . . section 1108 does not violate the due process clause.*' [Citation.]" (*Falsetta*, *supra*, 21 Cal.4th at pp. 917-918.)

In light of *Falsetta*, we thus reject defendant's contention Evidence Code section 1108 is unconstitutional. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*) [noting under the "doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].)

B. *Evidence Code Section 352*

Defendant also contends the court erred in admitting under Evidence Code section 352 evidence of his uncharged sexual misconduct against Nicole. We disagree.

14

1. Guiding Principles

A court "must engage in a careful weighing process under [Evidence Code] section 352" when determining whether to admit "propensity" evidence under Evidence Code 1108. (*Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.) "Specifically, the court weighs factors such as the 'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 41.)

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).)

2. Brief Additional Background and Analysis

The record shows in his trial brief, defendant moved to exclude the uncharged sexual misconduct against Nicole, arguing the probative value of such evidence was substantially outweighed by its prejudicial nature. In making this argument, however, the record shows defendant offered no explanation regarding *why* the probative value of such evidence was substantially outweighed by its alleged prejudicial effect.

15

In any event, during oral argument on this issue the record shows defendant claimed Nicole should not be allowed to testify regarding the uncharged sexual misconduct because it "unfairly paint[ed defendant] as having some sort of prior offense similar to the offense that [he's] being accused of here, when actually nothing has ever been proven or substantiated in any degree." The court in response noted the evidence of uncharged sexual misconduct involving Nicole was relevant because Evidence Code section 1108 "made it relevant." Thus, the court indicated to defendant (who again, was self-represented) that "unless . . . by virtue of [Evidence Code section] 352, that is, that there is a reason that the Court should exercise its discretion and rule it out, it's going to come in. [¶] . . . [¶] So [defendant], you tell me, if the witness [i.e., Nicole] comes here to testify, and you have the ability to cross-examine her, ask her questions, why shouldn't she be allowed to testify?"

The record shows defendant continued to argue that Nicole's testimony should be excluded merely because he was having to defend himself "against something [he] ha[sn't] been charged with." Because defendant made the same arguments as before, the court again asked him to "zero in on [his Evidence Code section] 352 argument" because he essentially was arguing the law was "unfair."

The prosecutor in his offer of proof contended the uncharged sexual misconduct evidence was highly probative and not unduly prejudicial. Specifically, the prosecutor argued that Doe and Nicole were of similar ages when they were sexually abused by defendant, as both victims had been abused between the ages of about 10 and 14; that defendant's conduct with respect to both victims was similar, inasmuch as there was

16

sexual intercourse, oral copulation both of defendant and each victim, as well as digital penetration; and that because the "degree of molestation is the same," defendant's sexual misconduct against Nicole was "no more shocking" than his sexual misconduct against Doe. Because the uncharged sexual misconduct involved only one witness, and because there was a "slight overlap" in the time frames of the sexual abuse, the prosecutor argued Nicole's testimony was admissible under Evidence Code section 352. The court agreed and denied defendant's motion.

Here, we conclude the court properly admitted Nicole's testimony under Evidence Code section 352, as such evidence was highly probative, particularly in light of defendant's June 24, 2009 letter to Heather in which he professed his love for Nicole and his desire to "wait[]" for her.

Moreover, in each case defendant took advantage of young, vulnerable girls who trusted him. With respect to Nicole, the record shows she looked up to, and confided in, defendant, as her own father was then living in another state and she was being cared for by her much older great-grandparents because her mother was incarcerated. And of course with respect to Doe, defendant *was* her father and at least when the family lived in California, he was the *only* parent "caring" for her. Also, Doe and Nicole were of similar ages—between about 10 and 14 years old—when defendant was sexually abusing them.

In addition, defendant's sexual misconduct with respect to both victims was similar, as the prosecutor correctly noted, inasmuch as there was sexual intercourse, oral copulation both of defendant and each victim and digital penetration of each victim. (See *People v. Cromp* (2007) 153 Cal.App.4th 476, 480 (*Cromp*) [noting the fact a defendant

17

"committed a sexual offense on a particularly vulnerable victim in the past logically tends to prove he [or she] did so again with respect to the current offenses"]; see also *People v. Branch* (2001) 91 Cal.App.4th 274, 285 (*Branch*) [noting "if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses"].)

What's more, with respect to each victim, defendant's sexual misconduct escalated from touching, skin-on-skin, to oral copulation to sexual intercourse. And, in both cases, defendant repeatedly instructed the victims not to tell anyone about the ongoing abuse. (See *Branch*, *supra*, 91 Cal.App.4th at p. 285.) Also, defendant engaged in sexual misconduct against Nicole while the family was living in Pennsylvania, near or within the *same* general time period he began sexually abusing Doe. (See *ibid.* [noting "[r]emoteness of prior offenses relates to 'the question of predisposition to commit the charged sexual offenses' "].)

Finally, defendant's sexual misconduct conduct against Nicole was no more inflammatory than his sexual misconduct against Doe. To the contrary, the record shows defendant began sexually assaulting Doe when she was four years old, which included not only touching, skin-on-skin, but *also* oral copulation. As such, it was unlikely the jury was prejudicially impacted by the admission of the uncharged misconduct involving Nicole. (See *People v. Hollie* (2010) 180 Cal.App.1262, 1274 [noting a factor affecting the prejudicial effect of uncharged acts includes " 'whether the evidence of uncharged acts is stronger or *more inflammatory than the evidence of the charged offenses*' " (italics added)]; see also *People v. Karis* (1988) 46 Cal.3d 612, 638 [noting the "prejudice"

18

referred to in Evidence Code section 352 " 'applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues' " and further noting " ' "prejudicial" is not synonymous with "damaging" ' "].)

In sum, we conclude the court's ruling to admit evidence of uncharged sexual misconduct against Nicole was not "arbitrary, capricious and patently absurd." (See *Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

C. *CALCRIM No. 1191*

Further diminishing the potential for "undue prejudice" under Evidence Code section 352, subdivision (b) is the fact the court in the instant case instructed the jury with CALCRIM No. 1191. This instruction in part provided: "If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all other evidence. *It is not sufficient by itself to prove that the defendant is guilty of the charged offenses. The People must still prove each charge beyond a reasonable doubt.*" (Italics added.)

Defendant contends CALCRIM No. 1191 violates due process "because it expressly [told] the jury it may infer the defendant's guilt of the charged offenses if it finds, based on evidence of another sexual offense, the defendant is predisposed to commit such crimes and may be found to have committed the current crimes based on nothing other than the uncharged allegations." Defendant, however, acknowledges that our high court has held a substantially similar instruction to the one given in his case does not violate due process (see *Villatoro*, *supra*, 54 Cal.4th at pp. 1167-1168) and that we

19

*must* adhere to that ruling (see *Auto Equity*, *supra*, 57 Cal.2d at p. 455). We thus reject

this contention.[4]

II

CALCRIM No. 1111

Defendant next contends the court erred when it instructed the jury in connection

with counts 3 through 11—involving lewd or lascivious acts by force or fear on a child

under the age of 14 (§ 288, subd. (b)(1))—that "[i]t is not a defense that the child may

have consented to the act" as set forth in CALCRIM No. 1111.[5] Defendant contends that

---

[4]    In light of our conclusion that the court's decision to admit evidence of uncharged
sexual misconduct against Nicole was not improper (see *Goldsmith*, *supra*, 59 Cal.4th at
p. 266) and that the court properly instructed the jury with CALCRIM No. 1191 in
connection with the admission of such evidence (see *Villatoro*, *supra*, 54 Cal.4th at pp.
1167-1168), we reject defendant's further contention he was denied a fair trial based on
the "cumulative error" doctrine.

[5]    CALCRIM No. 1111, as given by the court, provided: "The defendant is charged
in Counts 3 through 11 with a lewd or lascivious act by force or fear on a child under the
age of 14 years in violation of Penal Code section 288(b)(1). [¶] To prove that the
defendant is guilty of this crime, the People must prove that: [¶] 1A. The defendant
willfully touched any part of a child's body either on the bare skin or through the
clothing; [¶] OR [¶] 1B. The defendant had the child touch his body, either on the bare
skin or through the clothing; [¶] 2. In committing the act, the defendant used force,
violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or
someone else; [¶] 3. The defendant committed the act with the intent of arousing,
appealing to, or gratifying the lust, passions, or sexual desires of himself or the child; [¶]
AND [¶] 4. The child was under the age of 14 years at the time of the act. [¶] Someone
commits an act willfully when he or she does it willingly or on purpose. It is not required
that he or she intend to break the law, hurt someone else, or gain any advantage. [¶]
Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the
perpetrator or the child is not required. [¶] The force used must be substantially different
from or substantially greater than the force needed to accomplish the act itself. [¶] Duress
means the use of a direct or implied threat of force, violence, danger, hardship, or
retribution sufficient to cause a reasonable person to do or submit to something that he or

20

*People v. Soto* (2011) 51 Cal.4th 229 (*Soto*) constituted an unforeseeable expansion of statutory criminal liability that cannot be retroactively applied to him as a matter of due process because counts 3 through 11 occurred pre-*Soto*, between 1999 and 2009. We disagree.

In *Soto*, our high court concluded: "Lack of consent by the child victim is not an element of either lewd act offense defined in section 288. Nor is willingness by the child a defense to either crime. *For over 100 years, California law has consistently provided that children under age 14 cannot give valid legal consent to sexual acts with adults*. (See, e.g., *People v. Verdegreen* (1895) 106 Cal. 211, 214–215.) The Legislature has drafted the child molestation laws to make issues regarding the child victim's consent immaterial *as a matter of law* in these cases." (*Soto*, *supra*, 51 Cal.4th at p. 238, italics added.)

The court in *Soto* recognized that when the "Legislature amended section 288(b) *in 1981* to delete the previous requirement that lewd acts committed by use of force, violence, duress, menace, or fear be 'against the will of the victim,' it effectively removed the concept of consent from child molestation cases. 'The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the

she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant. [¶] Retribution is a form of payback or revenge. [¶] Menace means a threat, statement, or act showing an intent to injure someone. [¶] An act is accomplished by fear if the child is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it. [¶] It is not a defense that the child may have consented to the act. [¶] Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun."

conclusion that the act should not be construed to include the omitted provision.' [Citation.] *Since 1981*, the lewd act crimes in section 288 have been defined based on the offender's wrongful conduct only. The victim's 'consent,' such as it may be, is no longer material in these cases." (*Soto*, *supra*, 51 Cal.4th at p. 245, italics added.) Thus, contrary to defendant's argument, *Soto* in 2011 did not expand statutory criminal liability under section 288, subdivision (b) by eliminating consent as a defense.

Pre-*Soto* case law relied on by defendant, including principally *People v. Cicero* (1984) 157 Cal.App.3d 465 (*Cicero*), is also of no assistance: *Soto* itself recognized that "*no* decision has actually held that consent is a defense when it is alleged that lewd acts were accomplished by duress. As noted, the issue of duress was not presented in *Cicero*; therefore, the majority's discussion of it was dictum. Although other decisions have repeated *Cicero*'s dictum, none has directly ruled that a child victim's consent negates a finding of duress under section 288(b)(1)." (*Soto*, *supra*, 51 Cal.4th at p. 247.) For this additional reason, we reject defendant's contention his due process rights were violated when the court instructed the jury with CALCRIM No. 1111 and, in particular, with the language that it is not a defense to aggravated lewd conduct that a child may have consented.[6]

---

6    In light of our decision, we deem it unnecessary to address the People's alternate contention that defendant forfeited this claim by failing to raise a due process objection in the trial court.

22

III

Lesser Included Offenses on Counts 1 and 2

Defendant next contends the court erred in failing to instruct the jury sua sponte on the alleged lesser included offenses of nonforcible oral copulation in connection with count 1 (aggravated oral copulation) and unlawful sexual intercourse with a minor in connection with count 2 (aggravated rape of a child). With respect to count 1, he contends that nonforcible oral copulation on a child under the age of 14 (§ 288a, subd. (c)(1)) is a lesser included offense to aggravated oral copulation on a child under the age of 14, for which he was convicted (§§ 269, subd. (a)(4), 288a, subd. (c)(2) or (3)).

Assuming, *without* deciding, that nonforcible oral copulation is a lesser included offense of aggravated oral copulation, we nonetheless conclude any such failure to instruct was harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *People v. Breverman* (1998) 19 Cal.4th 142, 149, 165 (*Breverman*) [noting the failure to instruct on a lesser included offense in a noncapital case is reviewed under the *Watson* standard of harmless error, which provides reversal is not required "unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred"].) In analyzing this issue, we focus "not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, [we] may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no

23

reasonable probability the error of which the defendant complains affected the result." (*Id.* at p. 177.)

Here, the record shows at trial defendant did not proceed on the theory that he and Doe engaged in consensual, nonforcible oral copulation. Instead, he argued Doe, at the urging of others including her mother Heather, made up the allegations of *all* sexual misconduct, which *included* Doe's testimony that defendant orally copulated her in their first home in Corona and about 10 times when they moved to their "new" home in Corona. Because the jury clearly rejected defendant's theory, we conclude it was not reasonably probable that the jury would have returned a verdict more favorable to defendant had the court instructed the jury on the alleged lesser included offense of nonforcible oral copulation in connection with count 1. (See *Breverman*, *supra*, 19 Cal.4th at p. 149.)

In addition, the evidence establishing defendant's guilt on count 1, aggravated oral copulation, was compelling. Doe testified that she was unable to "squirm" away from defendant when he orally copulated her because he held her by the "hips." Doe also testified that she was afraid of defendant; that she tried to tell defendant "no" but that he would not take "no" for an answer; and that defendant repeatedly told her not to tell anyone about the sexual misconduct, including oral copulation, because the police would be called and she and her brother C. would be taken away. Thus, on this record, the failure to instruct the jury regarding nonforcible oral copulation was harmless, as there is no reasonable likelihood that this instruction would have resulted in an outcome more favorable to defendant on count 1.

24

For the same reasons, we conclude with respect to count 2 (aggravated rape of a child (§§ 269, subd. (a)(1) & 261, subd. (a)(2) or (6)) that any alleged error in failing to instruct the jury with the alleged lesser included offense of unlawful sexual intercourse with a minor (§ 261.5) was harmless.  (See *Breverman*, *supra*, 19 Cal.4th at p. 149.)

IV

Cruel and Unusual Punishment

Defendant contends that his indeterminate sentence of 30 years to life followed by the determinate sentence of 73 years constitutes cruel and unusual punishment under the federal and California Constitutions.  (U.S. Const., 8th Amend. [prohibits infliction of "cruel and unusual" punishment]; Cal. Const., art. I, § 17 [same].)  We disagree.

The Eighth Amendment of the federal Constitution is violated when a sentence is " 'grossly disproportionate' " to the crime.  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001.)  Similarly, the California Constitution is violated when the punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.)  " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' "  (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

We generally examine three factors to determine whether a sentence is proportionate to the offense and the defendant's circumstances such that it does or does not constitute cruel and unusual punishment: " '(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same

25

jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.' [Citation.]" (*Ewing v. California* (2003) 538 U.S. 11, 22 (*Ewing*).)

Here, defendant does not address the sentences imposed on other criminals in the same jurisdiction or the sentences imposed for commission of the same crime in other jurisdictions. Accordingly, we limit our analysis to the gravity of the offense and the harshness of the penalty.

"The gravity of an offense can be assessed by comparing the harm caused or threatened to the victim or society and the culpability of the offender with the severity of the penalty." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1077, citing *Solem v. Helm* (1983) 463 U.S. 277, 292.) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing*, *supra*, 538 U.S. at p. 23 (plur. opn. of O'Connor, J.).) "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.)

Applying these standards here, we independently conclude there is no gross disproportionality between the gravity of defendant's offense and the harshness of the penalty imposed by the court. Indeed, the harm defendant caused Doe was significant. The record shows that defendant's sexual misconduct against Doe began when she was four years old, when defendant forced her to touch his erect penis, skin-on-skin, *and* orally copulate him; that while Doe was in kindergarten after the family moved to Corona, defendant again forced Doe to touch his penis, skin-on-skin, and to orally

26

copulate him; that during a six-year period when Doe was between the ages of five and 11, Doe estimated she orally copulated defendant "probably over" 20 times; that when she was in the fourth grade, defendant forced Doe to have sexual intercourse in the bathroom and when Doe made a sound because it hurt, he stopped and *then* forced Doe to orally copulate him; that during this same six-year period, Doe estimated defendant forced her to have sexual intercourse about five or six times; that defendant also touched Doe's genitalia both over and under her clothes about 10 to 15 times during this time period and digitally penetrated her vagina about five to 10 times; that when the family moved to the "new" house in Corona when Doe was about 11 years old, defendant forced Doe to orally copulate him about four times a month, until she finally disclosed the abuse when she was 14; that during this three-year period, defendant also forced Doe to have sexual intercourse about 10 or 15 times and orally copulated her about 10 times and digitally penetrated her about the same number of times; and that when she was old enough to get pregnant, defendant on one occasion made Doe take a pregnancy test after he inquired about her missing her period.

The record further shows during the *10* or so *years* that defendant engaged in this severe sexual misconduct against Doe, he repeatedly would tell her not to disclose the abuse because the police would be called and she and her brother would be taken away. Doe testified she endured the sexual abuse by defendant because she believed it was the lesser of two evils, as she did not want either herself or her brother to end up in foster care.

27

In sum, given the length of time Doe endured the sexual misconduct by defendant, the number of instances and the severity of such misconduct, as summarized, and the fact defendant abused his position of trust over Doe, his daughter, we conclude he has failed to establish that his sentence is " ' "grossly disproportionate" to the crime.' "  (See *Ewing*, *supra*, 538 U.S. at p. 23 (plur. opn. of O'Connor, J.); see also *People v. Alvarado* (2001) 87 Cal.App.4th 178, 200 [rejecting the defendant's claim that a life term for rape during burglary was cruel and unusual because the "callous and opportunistic nature of his sexual assault against a neighbor he knew to be particularly vulnerable seems to us precisely the sort of sexual offense that warrants harsh punishment"].)

V

Abstracts of Judgment

Lastly, defendant contends, and the People agree, that the abstracts of judgment mistakenly provide defendant committed the offenses in 2009.  However, the record shows that only count 12 could have been committed in 2009, inasmuch as the record further shows the jury was specifically instructed as follows regarding the various time periods when defendant may have committed each of the 12 offenses:

"Count 1: 12/27/99-12/27/08; Count 2: 12/27/05-12/27/08; Count 3: 12/27/99-12/27/00; Count 4: 12/27/00-12/27/01; Count 5: 12/27/01-12/27/02; Count 6: 12/27/02-12/27/03; Count 7: 12/27/03-12/27/04; Count 8: 12/27/04-12/27/05; Count 9: 12/27/05-12/27/06; Count 10: 12/27/06-12/27/07; Count 11: 12/27/07-12/27/08; and Count 12: 12/27/08-06/10/09.

"The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day."

We agree with the parties that the abstracts of judgment should be corrected accordingly.

DISPOSITION

The trial court is directed to prepare amended abstracts of judgment to show the correct date ranges for counts 1 through 12, as the court instructed the jury. The trial court is further ordered to provide the Department of Corrections and Rehabilitation with certified copies of the corrected abstracts of judgment. In all other respects, defendant's judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.

29